TORRUELLA, Circuit Judge.
This is an interlocutory appeal by the government under the provisions of 18 U.S.C. § 3731 from an order of the district court suppressing evidence obtained pursuant to a search warrant. For the reasons stated hereinafter, we reverse. The district court concluded that the search warrant was based on information that was illegally obtained by government agents incident to defendant Charles Winston’s (“Winston”) arrest. Specifically, the court found that the observation by the arresting officers of a certain amount of cash in Winston’s nightstand, as well as of a safe located in the basement of his house, resulted from an unreasonable search in violation of Winston’s Fourth Amendment rights. Therefore, it found that this information could not be used to establish probable cause in support of the issuance of a valid search warrant. The court thus proceeded to invalidate the search warrant for lack of probable cause and consequently suppressed the evidence discovered thereunder, namely, $58,000 in cash, a scale with white powder residue, a hand gun, and ammunition.
I. Background
Pursuant to an investigation of a large-scale drug trafficking organization, federal agents obtained an indictment of Winston along with about twenty-five others on October 14, 2003. The indictment charged Winston with distributing cocaine on December 16, 2002 and with being part of a conspiracy to distribute cocaine between July 2002 and February 2003. Also on *117 October 14, 2003, a warrant issued for Winston’s arrest.
On October 15, 2003, agents went to Winston’s house to arrest him. Some of the agents had previously seen Winston, his girlfriend, and his distinctive blue BMW. One of the agents had arrested Winston about two weeks earlier for possession of a handgun. One of Winston’s codefendants had informed the agents that he had sold Winston two handguns and a bullet-proof vest.
Arriving at Winston’s house, a duplex, agents saw Winston’s car in the driveway of his house. The agents did not notice any other cars near the house. The agents surrounded the house and surveilled it for about an hour and a half, hoping that Winston would exit. During this time, the agents did not observe any activity in the house.
Agents then knocked on the door to Winston’s house, the right half of the duplex. Winston’s girlfriend answered the door, but the agents present did not know who she was. The agents asked her who owned the blue BMW. She denied knowing the owner of the car and suggested that the agents inquire next door. The agents did so, but no one responded.
About five minutes later, agents knocked again on the door to Winston’s house. In the meantime, Agent Burns had walked around the house to the vicinity of the front door. When Winston’s girlfriend opened the door, Agent Burns recognized her as Winston’s girlfriend. The agents then pushed past her into the house.
One agent shouted “Chuck,” and Winston immediately responded from upstairs “up here.” Agents went up the stairs with guns drawn. They saw Winston’s child near the top of the stairs and saw Winston in the hallway talking on a cell phone. This occurred within twenty seconds of entering the home. Agents ordered Winston to drop the phone. Winston complied, and agents put him in custody without a struggle. Agents did not conduct a protective sweep on the second floor. During this time, Agent Burns went upstairs to bring the child downstairs and out of harm’s way.
After handcuffing Winston with his hands behind his back, agents asked him for identification. Winston told them that it was in the nightstand in his bedroom. Because of clothes piled in the bedroom, the agents could not find the nightstand so they brought Winston into the bedroom and asked him again. Winston pointed to the nightstand with his shoulder. The agents opened the drawer in the nightstand to find Winston’s wallet on top of a large amount of cash.
Trooper Martin had entered the house at the same time as the group of agents who proceeded to the second floor, but he moved immediately through the living room and kitchen until he came upon a set of interior stairs which lead to the basement of the house. Thereupon he proceeded down the stairs into the basement for the purpose of securing that area. Upon reaching the basement floor he observed a furnace, and behind it an object covered by a blanket. He proceeded to remove the blanket and discovered a safe which measured approximately twenty-four inches in height by seventeen inches in width by twenty seven inches in depth. After having brought the child to the first floor, Agent Burns followed Trooper Martin into the basement where Trooper Martin showed him the safe. These two agents went back upstairs and, in Winston’s presence, informed the other agents of their discovery of the safe. Winston then stated, “That’s my safe.”
*118 II. Protective Sweep of the Basement
The Fourth Amendment protects individuals from unreasonable searches and seizures. Maryland v. Buie, 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Generally, the search of an individual’s house without a search warrant is unreasonable and violates the Fourth Amendment. Id. Exceptions to this general rule arise when the benefits to the public interest outweigh the individual’s privacy right. Id. One such exception is a protective sweep conducted in conjunction with the arrest of an individual in his home. Id. at 327.
“A ‘protective sweep’ is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.” Id. To prevent law enforcement from abusing the protective sweep by using it as a pretext for searching an individual’s home, the Supreme Court has limited its use. First, law enforcement officers conducting the sweep must have a reasonable suspicion of danger: “there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.” Id. at 334, 110 S.Ct. 1093 & n. 2. The reasonable suspicion standard is “considerably less demanding than the level of proof required to support a finding of probable cause,” United States v. Martins, 413 F.3d 139, 149 (1st Cir.2005), but must be based on more than an unfounded speculation, United States v. Cook, 277 F.3d 82, 85 (1st Cir.2002). Second, the scope of a protective sweep must be limited to its purpose. The sweep “may extend only to a cursory inspection of those spaces where a person may be found.” Buie, 494 U.S. at 335, 110 S.Ct. 1093. Additionally, the duration of the sweep must be “no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.” Id. at 335-36, 110 S.Ct. 1093.
The district court in this case held that the protective sweep violated the Fourth Amendment. We review the district court’s factual findings for clear error. United States v. Palmer, 203 F.3d 55, 60 (1st. Cir.2000). We review de novo the constitutional question of whether the protective sweep violated the Fourth Amendment. Id.
A. Reasonable Suspicion
The district court found that the agents did not have a reasonable suspicion to believe that a dangerous person could be in the basement. The government contests this finding and puts forth a number of facts to support a finding of reasonable suspicion. First, the agents had information to believe that Winston was armed and dangerous and possibly with armed and dangerous cohorts. Winston was indicted, along with twenty-five others, for distribution of cocaine as part of an investigation of a large-scale cocaine trafficking organization. One of the other defendants informed agents that he had sold Winston two handguns and a bullet-proof vest. One of the agents present had also previously arrested Winston after a traffic stop for possession of a handgun. Second, the government finds significant that Winston’s girlfriend initially denied having knowledge of Winston’s car. From this deception, the government argues that a reasonable agent could believe that the purpose of the deception was to gain time to allow Winston and/or his cohorts to hide, exit the house through another door or window, or prepare an ambush. Third, the government notes that when agents called out Winston’s name, Winston re *119 sponded “up here” from the second floor. The government found it unusual that Winston responded so casually from the second floor when agents forcibly entered his house and argues that a reasonable agent could believe that Winston’s unusual response was part of a scheme to escape or to allovs others in the drug organization to escape or ambush the agents.
In response, Winston argues that the circumstances would lead agents to believe that no others were present in the house. First, Winston notes that agents surveilled the house for an hour and a half and, during this time, saw no indication of anyone’s presence in Winston’s house. However, since Winston, his girlfriend, and their child were in the building but unobserved, others could easily have been in the home. Next, Winston finds significant that an agent testifying at the suppression hearing could not recall if there were other cars parked in Winston’s driveway or near Winston’s home, implying that there were no other cars and thus no sign of other people being present in Winston’s house. Winston argues that if cars were present the agent would have noticed them and would have been able to recall this fact. We refuse to ascribe such meaning to the agent’s failure to recall whether cars were present, especially given the lack of other relevant information. Finally, Winston points out that when the agents entered the house, they did not see or hear any evidence of another person. We do not find this highly relevant since the purpose of a protective sweep is to protect agents from concealed threats.
We find that, based on the information presented above, the agents had a reasonable suspicion to believe that a dangerous person could be in the basement. Underlying a protective sweep is the “ ‘risk of danger in the context of an arrest in the home’ due primarily to the reality that there may be ‘unseen third parties in the house.’ ” United States v. Lawlor, 406 F.3d 37, 41 (1st Cir.2005) (quoting Buie, 494 U.S. at 333, 336, 110 S.Ct. 1093). Winston was a potentially dangerous drug dealer who had recently purchased a bullet-proof vest and firearms and had numerous, potentially armed and dangerous cohorts. This risk was compounded by the deceptive actions of Winston’s girlfriend, which gave any potential occupants inside the house five minutes to conceal themselves or prepare an ambush. Further, given that Winston knew that agents had forcibly entered his house, his casual response inviting them upstairs was unusual. One would expect Winston either to evade the agents or to surrender to them by coming downstairs or responding that he was on his way down. His casual, inviting response could lead a reasonable agent to believe that it was part of a scheme to lead the agents away from the basement because others were hiding there waiting to escape or launch a surprise attack on the agents. “The fact that the sweep revealed that there was no person [in the basement] has no bearing on whether [agents were] justified in conducting the sweep in the first place.” Id. at 42 n. 5. We think that a reasonably prudent agent could believe “that there was a distinct possibility that a man was hiding in the [basement].” Martins, 413 F.3d at 150. When agents arrest an armed criminal with known cohorts in his home, they put themselves in a dangerous situation and must be able to protect themselves. In these situations, the experienced perceptions of law enforcement agents deserve deference and constitute a factor in our reasonable suspicion analysis. Id. at 150 & n. 4.
B. Scope
Additionally, the district court found that the scope of the sweep was excessive because agents immediately arrested Win *120 ston, and agents could have protected themselves by guarding the top of the stairs. This [1] finding, however, begs the point. Obviously, the agents had the right to protect themselves not only from Winston but from all other circumstances reasonably within the scope of the dangers they were facing, i.e., an arrest involving a member of a drug organization with multiple constituents, not all of whom had been accounted for, who were likely to be armed, as Winston was, in a setting which presented an opportunity for ambush or similar violent conduct against the arresting officers.
The scope of the protective sweep in this case, in both location and duration, was within the bounds set forth by the Court in Buie. Officers may make only “a cursory inspection of those spaces where a person may be found.” Buie, 494 U.S. at 335, 110 S.Ct. 1093. Here, agents walked immediately through the first floor and basement and moved a blanket covering a space large enough for a person to hide. We find that their actions constituted a limited and cursory inspection.
Winston argues that the agents could have protected themselves by guarding the top of the basement stairs. As judges trained in the law, and not in apprehending suspects, we cannot determine in this situation how the agents could have gone about protecting themselves, but it does not seem logical or reasonable that given the circumstances previously explained, the agents would leave such an obvious hiding place, from which harm could be dispensed, unsecured. Even if Winston were correct, the validity of a protective sweep “does not turn on the availability of less intrusive investigatory techniques.” United States v. Sokolow, 490 U.S. 1, 11, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).
Winston also notes-that the agent did not descend cautiously into the basement and that agents did not conduct a protective sweep of the second floor, suggesting that the agents did not actually fear for their safety and that the protective sweep was merely a pretext to search Winston’s house. We do not agree with Winston that these particular choices by the agents necessarily indicate that the sweep was pretextual. An agent could determine that it would be safer to move silently and swiftly into the basement instead of announcing his presence. Further, agents need not coordinate their intentions to conduct a protective sweep. The validity of a protective sweep conducted by the agent on the first floor is not negated by the separate decision of agents on the second floor that a protective sweep is not there necessary. Regardless, the agents’ subjective intentions are not relevant as long as the protective sweep was objectively reasonable. Lawlor, 406 F.3d at 43 n. 8 (citing Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Furthermore, we are not here to second guess the agents as to how to conduct a protective sweep, for as stated, we are not qualified to do so nor is that within the Scope of our judicial duties. We are able, however, to pass upon whether their actions were objectively reasonable given the circumstances and constraints within which they operated. We believe they were.
The duration of the sweep must be “no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.” Buie, 494 U.S. at 335-36, 110 S.Ct. 1093. The facts show that Winston’s house was small and that Trooper Martin moved quickly into the basement. After arresting Winston, Agent Burns went into the basement to inform Trooper Martin of the *121 arrest, and all agents departed. There was no evidence that the agents lingered longer than necessary to arrest Winston.
C. Statement of Ownership
The district court also suppressed Winston’s statement admitting his ownership of the safe, because it arose from the illegal observation of the safe. Given our validation of the safe’s discovery and Winston’s failure to otherwise contest this statement on appeal, we conclude that this admission was also improperly suppressed.
III. Consent to Search the Nightstand
Another exception to the search-warrant requirement is a search by consent. United States v. Forbes, 181 F.3d 1, 5 (1st Cir.1999). In order to establish this exception, “the government must prove valid consent by a preponderance of the evidence.” Id. To be valid, a consent tó search must of course be voluntary. Id. The consent may be express or inferred from conduct. United States v. Miller, 589 F.2d 1117, 1130 (1st Cir.1978) (finding defendant’s unlocking of a suitcase to be implied-in-fact consent for officers tó search the suitcase). “The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search.” Id. We review the district court’s findings on voluntariness and consent for clear error. Id. We will uphold the district court’s finding as long as it is “fairly supported” by the evidence. United States v. Laine, 270 F.3d 71, 75 (1st Cir.2001).
The district court tersely found that Winston did not consent to the search of the nightstand that led to the retrieval of his wallet and the discovery of the cash: “His indication in response to questioning of where his wallet could be found cannot be construed as a consent to search.” Clearly, Winston did not explicitly consent to, a search of the nightstand, but the government argues that Winston’s actions amounted to an inferred consent or an implied-in-fact consent.
Winston points out several factors that weigh against a finding of consent: agents forced their way into Winston’s home, approached him with weapons drawn, ordered him to drop his cell phone, handcuffed him with his hands behind his back, and did not read him Miranda warnings. However, it is inherently reasonable for the agents to ask Winston for identification to verify his identity. See Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (“In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.”).
The facts clearly support a conclusion to the effect that Winston consented to the search of the nightstand. Upon being asked for verification of his identity, he verbally indicated that his wallet was in the nightstand in the bedroom. The agents could not immediately locate the nightstand in the bedroom, so they escorted Winston into the bedroom. When asked again for the location of his identification, he indicated with a shoulder movement in the direction of the nightstand. While the agents did not explicitly ask for permission to open the drawer tó retrieve Winston’s identification, the circumstances described would reasonably lead the agents to conclude that Winston was consenting to the opening of the drawér in the nightstand to allow for the retrieval of his wallet and identification. Any other conclusion would allow Winston the benefits of sandbagging the agents into committing a violation of his rights. Given the unquestioned facts, we see no reason why we should go along with such a deception.
In United States v. Cepulonis, agents bearing shotguns arrested and handcuffed *122 Cepulonis outside his hotel room. 530 F.2d 238, 243 (1st Cir.1976). Cepulonis requested to speak with his wife and child in the hotel room, and the agents allowed him to enter the hotel room in their company. Id. After conducting a protective sweep, the agents asked Cepulonis if there were any weapons in the room, to which he responded, “no, go ahead, search.” Id. at 244. We upheld the district court’s finding that the search was consensual. Id. Here, the inherent coerciveness of the situation is similar in that Winston was handcuffed, agents had drawn weapons, and family members were present. Favoring a finding of implied-in-fact consent in this case is the fact that a request for information about the location of Winston’s identification is much more benign than a request for information about the location of weapons.
We do not find it of decisive significance that in response to the agent’s question as to the location of the nightstand, Winston motioned with his shoulder rather than speaking. In other situations, we have found implied-in-fact consent based entirely on silent actions. See Robbins v. MacKenzie, 364 F.2d 45, 48 (1st Cir.1966). In Robbins, officers announced themselves at the door to a robbery suspect’s apartment and asked to speak .with him. Id. at 47. The suspect silently opened the door and walked back into the room. Id. We found that he “expresse[d] by his action as adequate a consent to entry as he would by a verbal invitation.” Id. at 48.
We do not lightly reverse a district court’s holding when reviewing for clear error. We note that the facts surrounding the search of the nightstand are undisputed, and thus we are not disturbing the district court’s findings of historical facts or credibility. Given the record as determined by the district court, we find that the district court’s holding that Winston’s acts did not constitute an implied-in-fact consent to open the drawer of the nightstand is not fairly supported by the record.
The district court did not determine whether Winston’s actions surrounding the search of the nightstand were voluntary. We have no trouble finding that Winston acted voluntarily.[1] As described above, an in-home arrest pursuant to a search warrant is an inherently coercive situation, but such a situation does not preclude a finding of voluntariness. United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The subject matter of the request, Winston’s identification, weighs heavily in favor of voluntariness. The agent testified that he routinely asks for identification when making arrests, and such a request is eminently reasonable. The mundaneness of identification makes it unlikely that agents would bother to use coercive methods to obtain it. Further, because Winston immediately responded to the agents’ requests, the evidence shows that Winston merely answered their questions and was not coerced into doing so.
IV. Conclusion
The district court erred in suppressing the evidence obtained pursuant to the search warrant and Winston’s statement claiming ownership of the safe. The motion to suppress is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

Reversed and Remanded.

. Because we find no serious question as to whether Winston acted voluntarily, we see no need to remand to the district court to make this determination. See United States v. Byram, 145 F.3d 405, 407 (1st Cir.1998).