# United States Court of Appeals
## For the First Circuit

Nos. 18-1661, 18-1664

UNITED STATES OF AMERICA,

Appellee,

v.

SANDY HERNANDEZ-MIESES,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Rafael F. Castro Lang for appellant.
Francisco A. Besosa-Martínez, Assistant United States
Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States
Attorney, and Mariana E. Bauzá-Almonte, Assistant United States
Attorney, Chief, Appellate Division, were on brief, for appellee.

July 31, 2019

**LIPEZ**, <u>Circuit Judge</u>.  Sandy Hernandez-Mieses appeals from the district court's partial denial of his motion to suppress evidence seized from his home on the day of his arrest on drug and money laundering charges in Cataño, Puerto Rico.  Specifically, he challenges the district court's conclusion that federal law enforcement agents validly relied on exceptions to the warrant requirement when they searched his home, a cargo van inside his garage, and a minivan parked in his driveway.  He also asserts more broadly that the entire operation was tainted by the agents' unlawful intention to execute a warrantless search even before they entered his home to execute the arrest warrant.

After careful review, we affirm the district court's determination that a gun, cellphones, and cash were lawfully seized from the first floor, and we reject Hernandez-Mieses's contention that the entire operation was tainted.  However, because we cannot determine on this record that the cellphones on the second floor and the drugs in the cargo van were lawfully seized, we vacate the district court's denial of suppression as to those items and remand for further findings concerning the duration and scope of the purported protective sweep.  We also vacate and remand as to the application of the automobile exception to the cargo van so that the district court can reconsider the issue based on its conclusions regarding the sweep.  Finally, we vacate the district court's order as to the items seized from the minivan and remand

so that the district court can determine in the first instance whether the minivan was within the curtilage of Hernandez-Mieses's home.

## I.

We recount the facts as found by the district court, consistent with record support, with the addition of undisputed facts drawn from the suppression hearing. See United States v. Dancy, 640 F.3d 455, 458 (1st Cir. 2011). Hernandez-Mieses was charged, along with five co-defendants, in a seven-count indictment alleging a conspiracy to import and distribute cocaine. These charges arose from "Operation Beach Break," a maritime drug smuggling investigation by the Caribbean Corridor Strike Force of Homeland Security Investigations ("HSI").

On November 1, 2016, federal agents executed an arrest warrant for Hernandez-Mieses at his home outside San Juan. Among the agents was Ricardo Nazario, a special agent with HSI for approximately sixteen years and a group supervisor with the Strike Force for the previous seven. Nazario had previously surveilled Hernandez-Mieses at this home and knew that he used a wheelchair. Before executing the arrest warrant, Nazario briefed the other agents on the high probability that they might encounter weapons, narcotics, and cash inside the house. Approximately twenty agents with ten vehicles were involved in executing the arrest warrant,

and they were accompanied by Honzo, a Customs and Border Protection dog trained to detect both concealed humans and narcotics.

The agents arrived at what Nazario described as an "average"-sized, two-story house at around 5:45 AM. Upon arrival, Nazario noticed that the first floor lights were on and observed shadows of several individuals through the frosted-glass front windows. Nazario was not expecting that people other than Hernandez-Mieses would be in the house, or that anybody would be awake at the time. He approached the frosted-glass front door, accompanied by another special agent, and announced himself as the police. He then saw the shadow of a person approach the front door and lock it from the inside. Nazario and the other agent broke the frosted glass in two places and looked through the openings. From the photographs admitted into evidence at the suppression hearing and Nazario's testimony, it appears that the first floor was essentially an open space with four modes of egress: the front door; sliding doors leading to the back terrace; a side door leading from the kitchen to the pool area and garage; and stairs leading to the second floor.

Nazario saw Hernandez-Mieses in his wheelchair near the dining table with two other individuals. Nazario reached through one of the holes in the door, unlocked it, and chased the two men, who fled through the back terrace doors and jumped the property's rear fence. During this initial brief pursuit, other agents

entered the house behind Nazario and handcuffed Hernandez-Mieses. All told, approximately ten agents entered the house and ten remained outside to secure the perimeter, which was accomplished shortly after the arrest.

Having lost the fleeing individuals,[1] Nazario returned from the terrace and observed a Glock handgun on the kitchen counter, approximately ten feet from where Hernandez-Mieses was sitting and close to the staircase leading to the second floor. The agents observed four cellphones and a bag with cash on the dining table.[2] Nazario also observed that the door from the kitchen to the adjacent swimming pool area and garage was open.

Nazario then ordered what he characterized as a protective sweep of the house based on his expressed concern that there could be people hiding who might pose a threat to the agents.[3] Honzo accompanied the agents during the sweep. After taking five to

---

[1] Nazario directed two agents who were securing the perimeter to pursue the men who fled. One man, Yonathan Jimenez-Diaz, was apprehended a few blocks away, while the other, Oniel Lajara-De La Cruz, remained a fugitive at the time of the suppression hearing.

[2] The relationship between the bag and the cash is not entirely clear from the record -- that is, it is unclear whether the cash was outside the bag or inside the bag but nonetheless visible. Regardless, Hernandez-Mieses has not contended that the agents had to open or otherwise manipulate the bag to observe the cash.

[3] Nazario and the government referred to a "security sweep" throughout the suppression hearing, but we will use the more common "protective sweep," as the parties do in their briefing.

seven minutes to sweep the first floor, including a bathroom, the agents proceeded to the second floor, where they swept two bedrooms, two bathrooms, and a master bedroom. In one of the bedrooms, Honzo alerted to a bag in front of the bed containing four kilograms of cocaine. Nazario also observed four cellphones on the bed in that room. In the master bedroom, Honzo "alerted to and opened" a shoebox inside the closet, which contained $34,000 in cash.

The agents proceeded through the open door off the kitchen to the garage, where they saw a cargo van.[4] Nazario touched the hood of the cargo van, which was hot; noticed that the tires were covered with sand and mud and that there was water dripping from the cargo area; and smelled saltwater and fuel.

Nazario, who was accompanied by five other agents, said he opened the cargo van's unlocked rear doors to "[s]earch[] for people hiding." Inside, Nazario observed more than forty wet, sandy bales of what he took to be narcotics.[5] The agents also

_____

[4] The frosted-glass garage door opening onto the driveway was closed.

[5] The bales were marked with different logos (for example, "Harley Davidson Motorcycles," "NBA," and a smiley face) that Nazario recognized, based on his experience, as the type of marking drug traffickers use to identify drug deliveries. The district court found, and the record supports, that Honzo alerted at the bales after the van was opened. At some point, a field test confirmed that the bales contained approximately 1,700 kilograms of cocaine.

looked in a closet next to the van. According to Nazario, the sweep was completed once the agents swept the garage, approximately twenty-two minutes after they arrived at the house.[6]

The agents then called a government attorney, who told them that they could perform a full search of the house. Before doing so, however, Nazario approached the minivan parked in the driveway in front of the garage door, which he had previously seen Hernandez-Mieses driving. Nazario observed sand on the tires and interior carpet, and he touched the hood, ascertaining that it was hot. Using keys located on top of the dining table, the agents unlocked the minivan and searched the interior. Among other items, they found a loaded Glock in the compartment between the two front seats, a paper bag full of money in front of that compartment, and a wallet in the passenger door containing identification documents for Lajara-De La Cruz.[7] The agents then performed a comprehensive

---

[6] The district court supportably found, based on call logs in the record, that "between 5:45 a.m. and 6:07 a.m. (22 minutes), the law enforcement agents arrived at the scene, arrested Hernandez, [and] performed [the] protective sweep." United States v. Hernandez-Mieses, 257 F. Supp. 3d 165, 174 n.8 (D.P.R. 2017). Nazario indicated that the agents also swept the perimeter areas of the house (such as the pool area and back terrace), but it is unclear when this was done. Nazario did not suggest that the agents who swept the house's interior also swept the perimeter.

[7] At some point, agents also searched another vehicle parked in front of the house, but nothing was seized. That vehicle was registered to Hernandez-Mieses. The minivan was registered to his wife, and the cargo van was registered to a third party.

search of the house and seized multiple incriminating items, including cash, a firearm, and ammunition.

After his arrest and the search, Hernandez-Mieses was charged in a second indictment along with Jimenez-Diaz and Lajara-De La Cruz. Hernandez-Mieses filed a motion to suppress all evidence seized from his house on the day of his arrest. After a hearing, at which agent Nazario was the sole witness, the district court suppressed the drugs and cash found by Honzo on the second floor and all evidence seized during the warrantless search of the house conducted after the agents called the government attorney. But it declined to suppress the gun and cash found on the first floor, the cellphones found in the bedroom on the second floor, the drugs found in the cargo van, and the items found in the minivan. After the district court denied his motion for reconsideration, which focused on the cargo van, Hernandez-Mieses entered a joint straight plea to both indictments, reserving his right to appeal the district court's suppression order. He was sentenced to a total of 180 months of imprisonment on the two indictments. This timely appeal followed.

## II.

When reviewing a district court's denial of a motion to suppress, we ordinarily assess the district court's findings of fact for clear error and its conclusions of law de novo. United States v. Ackies, 918 F.3d 190, 197 (1st Cir. 2019). If the

evidence at issue was seized during a warrantless search, "it is the government's burden to demonstrate the legitimacy of the search." United States v. Winston, 444 F.3d 115, 123-24 (1st Cir. 2006).

The Fourth Amendment protects all persons "against unreasonable search and seizures." U.S. Const. amend. IV. Because "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," Payton v. New York, 445 U.S. 573, 585 (1980)(internal quotation marks omitted), "a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies," United States v. Infante, 701 F.3d 386, 392 (1st Cir. 2012). Hernandez-Mieses concedes that the agents possessed a valid arrest warrant, which entitled them to enter his home to arrest him. See Payton, 445 U.S. at 603. But he contends that the agents' actions were tainted because they also intended to perform a warrantless search of his home. Moreover, regardless of the agents' intent, he contends that their actions did not fit any exception to the warrant requirement and were therefore unlawful; in particular, he argues that the agents were not effectuating a lawful protective sweep when they spotted the cellphones in the second floor bedroom and the drugs in the cargo van. Finally, he contends that the agents had no lawful basis for searching the minivan in the driveway.

## A. Agents' Intention to Perform a Warrantless Search

Hernandez-Mieses contends that the agents' actions were tainted from the start by a pre-existing intention to perform a warrantless search of his entire home before they had any basis for doing so.  Because he did not raise this argument before the district court, it may well be deemed waived.  See, e.g., United States v. Reyes-Rivas, 909 F.3d 466, 470 n.2 (1st Cir. 2018).  But even if it was not forfeited or waived, the argument is plainly without merit.  As a matter of law, "[a] police officer's subjective motive, even if improper, cannot sour an objectively reasonable search."  Spencer v. Roche, 659 F.3d 142, 149 (1st Cir. 2011).  We also reject the factual premise of Hernandez-Mieses's argument.  To support his contention that the agents harbored a pre-existing intention to perform a warrantless search, Hernandez-Mieses points to Nazario's briefing of the other agents, during which Nazario told them that "there was a high probability of finding weapons, narcotics, and currency in the house."  But, as Nazario explained during his testimony, this statement can reasonably be understood as a notice or reminder to his colleagues that they were likely to "encounter those items [weapons, narcotics, and currency] inside the house."  Indeed, the agents did encounter a weapon and cash in plain view while arresting Hernandez-Mieses.  We discern no suggestion of an intention to perform a warrantless search from Nazario's briefing.

Hernandez-Mieses also points to the agents' use of Honzo. Specifically, he asserts that they brought Honzo into the house as soon as they entered to arrest Hernandez-Mieses, suggesting that they intended to use the dog to effect a warrantless search from the start. But again, Hernandez-Mieses misreads the facts. Nazario's testimony is clear that although Honzo "tagged along" with the agents when they went to the house to execute the arrest warrant, the dog did not enter until Nazario ordered the sweep.[8]

Accordingly, we reject Hernandez-Mieses's argument both as a matter of law and of fact.

## B. Seizure of Cash, Cellphones, and Gun from First Floor (Plain View)

The district court determined that the government lawfully seized the cash and four cellphones from the dining table and the gun from the kitchen counter pursuant to the "plain view" doctrine. That doctrine "permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015). We

---

[8] The record is not entirely clear as to whether Honzo entered the house at the start of the sweep or entered when the agents proceeded to the second floor. In any event, this distinction is immaterial to our analysis.

- 11 -

review a district court's conclusion that the plain view doctrine applies for clear error. See id.

Hernandez-Mieses has offered no developed argument that the district court erred in applying the plain view doctrine, and any such argument is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). What is more, even absent waiver, this contention of error would be unavailing. By virtue of the arrest warrant, the agents were lawfully in a position from which the cash, cellphones, and gun "were easily visible to the naked eye," United States v. Sanchez, 612 F.3d 1, 5 (1st Cir. 2010), and the incriminating nature of those items as common tools of the drug trade was apparent. See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also United States v. Martinez-Molina, 64 F.3d 719, 728 (1st Cir. 1995) (recognizing that cellphones are known tools of the drug trade). We therefore reject Hernandez-Mieses's contention that the cash, cellphones, and gun should be suppressed.

**C. Seizure of Cellphones from Second Floor and Drugs from Cargo Van (Protective Sweep)**

The district court determined that the agents lawfully seized the four cellphones from the upstairs bedroom and the drugs from the cargo van because they were found during a lawful protective sweep. Hernandez-Mieses does not contest that the cellphones were in plain view to anyone in the upstairs bedroom, or that the drug

- 12 -

bales were in plain view once the agents opened the cargo van.[9]
Rather, he contends that the agents did not have a right to enter
the upstairs bedroom or open the cargo van because they were not
executing a protective sweep when they accessed those locations.
We review de novo the question of whether a warrantless search was
a permissible protective sweep. Winston, 444 F.3d at 118.

**1. Applicable Law**

The Supreme Court has described a "protective sweep" as "a
quick and limited search of premises," usually incident to an
arrest, that is "conducted to protect the safety of police officers
or others" at the scene. Maryland v. Buie, 494 U.S. 325, 327
(1990). Such a search is "narrowly confined to a cursory visual
inspection of those places in which a person might be hiding."
Id.[10] For law enforcement to justify a protective sweep, the
officers must have a "reasonable suspicion of danger," that is,
"there must be articulable facts which, taken together with the
rational inferences from those facts, would warrant a reasonably

---

[9] See United States v. Banks, 884 F.3d 998, 1015-16 (10th Cir.
2018) ("Generally, officers can seize any incriminating items that
they find in plain view during a protective sweep.").

[10] The Court in Buie also noted that, "as a precautionary
matter and without probable cause or reasonable suspicion,"
officers are permitted to "look in closets and other spaces
immediately adjoining the place of arrest from which an attack
could be immediately launched." 494 U.S. at 334. That type of
warrantless search is not at issue in this case because the
cellphones on the second floor and the drugs in the cargo van were
not found in immediate proximity to Hernandez-Mieses.

prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334. "[A] mere 'inchoate and unparticularized suspicion or hunch'" that someone is hiding who could pose a danger to the arresting officers is not enough to support a protective sweep. Id. at 332 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). But the reasonable suspicion standard "is considerably less demanding than the level of proof required to support a finding of probable cause." Winston, 444 F.3d at 118. And we are ordinarily hesitant to second-guess an officer's determination that a protective sweep is necessary: "[T]he experienced perceptions of law enforcement agents deserve deference and constitute a factor in [the] reasonable suspicion analysis." Id. at 119.

Reasonable suspicion, however, is just part of the analysis. A protective sweep also must be limited in scope to "a cursory visual inspection of those places in which a person might be hiding." Buie, 494 U.S. at 327; see also United States v. Nascimento, 491 F.3d 25, 49 (1st Cir. 2007) (assuming that a protective sweep would not allow looking inside a cabinet "too small to accommodate a person"). And, of crucial importance in this case, a protective sweep must be limited in duration and "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to

- 14 -

complete the arrest and depart the premises."  Buie, 494 U.S. at 335-36.

The sweep in Buie, the case in which the Supreme Court first articulated the modern protective sweep doctrine, illustrates the type of cursory search that the doctrine contemplates.  The Supreme Court described Buie's arrest and the ensuing sweep as follows:

> Once inside [the house to execute the arrest warrant], the officers fanned out through the first and second floors.  Corporal James Rozar announced that he would "freeze" the basement so that no one could come up and surprise the officers.  With his service revolver drawn, Rozar twice shouted into the basement, ordering anyone down there to come out . . . . Eventually, a pair of hands appeared around the bottom of the stairwell and Buie emerged from the basement.  He was arrested, searched, and handcuffed by Rozar.  Thereafter, [another officer] entered the basement "in case there was someone else" down there.  He noticed a red running suit lying in plain view on a stack of clothing and seized it.

Buie, 494 U.S. at 328 (citation omitted).[11]  Thus, the sweep in Buie was demonstrably a cursory scan of the area from which the defendant had just emerged after initially hiding from the officers who had come to arrest him.  See Cursory, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/cursory (defining "cursory" as "rapidly and often superficially performed or produced").

---

[11] The Court in Buie remanded for the state court to apply the newly enunciated standard for protective sweeps to the basement search at issue.

- 15 -

Consistent with Buie, courts have typically approved only short sweeps when expressly considering duration in cases involving the sweep of a home. See United States v. Alatorre, 863 F.3d 810, 815 (8th Cir. 2017) (protective sweep of four rooms on one floor of residence "lasted two minutes"); United States v. Silva, 865 F.3d 238, 243 (5th Cir. 2017) (sweep of trailer home lasted less than a minute); United States v. Contreras, 820 F.3d 255, 269 (7th Cir. 2016) (protective sweep of house "lasted less than a minute"); United States v. Henderson, 748 F.3d 788, 793 (7th Cir. 2014) (protective sweep of house lasted "no longer than five minutes"); United States v. Laudermilt, 677 F.3d 605, 608–09 (4th Cir. 2012) (sweep of two-story house "from start to finish, lasted about five minutes"); United States v. Hauk, 412 F.3d 1179, 1184 (10th Cir. 2005) (sweep of residence "lasted approximately five to ten minutes"); United States v. Flowers, 424 Fed. App'x 302, 303 (5th Cir. 2011) (protective sweep of two-story house and garage "lasted no longer than five minutes"); see also Fishbein ex rel. Fishbein v. City of Glenwood Springs, Colo., 469 F.3d 957, 959 (10th Cir. 2006) (noting, in the context of rejecting a civil suit challenge to a protective sweep, that "estimates regarding how long the officers were in the home range from thirty seconds to slightly less than five minutes"); but see Gomez v. Feissner, 474 Fed. App'x 53, 56 (3d Cir. 2012) (holding that officer was

- 16 -

entitled to qualified immunity from claim that protective sweep lasting five to fifteen minutes was unlawful).

While we do not suggest that a purported sweep of a certain duration should necessarily be deemed invalid per se, the length of the sweep obviously is an important factor in assessing its lawfulness. Courts have recognized that a short sweep is an indication that the search was truly cursory in nature. See, e.g., United States v. Burrows, 48 F.3d 1011, 1017 (7th Cir. 1995) ("The record supports the determination that the search of the four bedrooms and linen closet, which required the officers to force four locked doors, took no more than five minutes, an interval compatible with the officers' legitimate purpose."); United States v. Hogan, 38 F.3d 1148, 1150 (10th Cir. 1994) ("[I]t appears from the officer's testimony that the protective sweep could have truly been cursory and ended . . . a few minutes after the arrest."); see also United States v. Lesane, 685 Fed. App'x 705, 722 (11th Cir. 2017) (noting that protective sweep of single-story house "took no longer than three or four minutes, lending support to the conclusion that the sweep was cursory in nature").

## 2. Application of the Law to the Facts

Reviewing the facts known to the agents, we readily conclude that a reasonable officer would have held a reasonable suspicion of danger supporting a protective sweep. See United States v. Delgado-Pérez, 867 F.3d 244, 252 (1st Cir. 2017) (explaining that

- 17 -

we consider whether "the facts available at the moment of the . . . search [would support] a man of reasonable caution in the belief that the action taken was appropriate").

At the time the officers arrested Hernandez-Mieses, they knew the following: they had arrived at the house at 5:45 AM and found multiple people up and about; when they approached the front door, they saw the shadows of several people through frosted glass; when they announced themselves, a person inside locked the door; when they entered, they saw three people, but observed four cellphones on the table; they observed a gun; finally, they saw a staircase close to the counter where the gun was found and an open door leading from the kitchen to the pool area and garage. In short, there was a wealth of information supporting a reasonable suspicion that an armed person could be hidden on the first floor, or could have fled to the second floor or out the open door off the kitchen, between the time the agents announced themselves and the time they entered the house. This case is therefore distinguishable from those in which we have determined a purported protective sweep was invalid because (a) there was a complete lack of objective facts supporting a reasonable suspicion that a dangerous person could be hiding in the area searched, see, e.g., United States v. Serrano-Acevedo, 892 F.3d 454, 459-60 (1st Cir. 2018); Delgado-Pérez, 867 F.3d at 253-54, or (b) the facts supported a

contrary belief that the area searched was in fact empty, see United States v. Paradis, 351 F.3d 21, 29 (1st Cir. 2003).

However, as we have noted, reasonable suspicion is just part of the analysis. On this record, we have concerns that the search of the second floor and the cargo van may not have been consistent with a protective sweep's limited duration and scope. See Buie, 494 U.S. at 327, 335-36. For example, if the sweep took the major part of the twenty-two minutes from when the agents arrived at the house until they called the government attorney, the sweep would have been longer than those typically approved in comparable situations. See supra Section II.C.1. Indeed, the sweep of the first floor alone -- five to seven minutes -- matched or exceeded the length of some sweeps of entire residences. See id. Further, the problematic implication of the sweep's lengthy duration is compounded by the large number of agents on the scene. Nazario testified that at least ten officers entered the house, and that, when he opened the cargo van, at least five officers were present. It stands to reason that the large number of agents conducting the sweep should have resulted in a search of shorter duration.

The scope of the sweep also prompts concerns in the sense that the agents' actions in this case suggest that this may not have been the cursory sweep required by the Supreme Court. The agents twice paused to inspect evidence in areas where no person could hide and that were not in plain view. In particular, in

- 19 -

suppressing the drugs the agents found in one of the upstairs bedrooms, the district court concluded that the cocaine bricks were not in plain view, meaning that the agents had to have manipulated or otherwise searched the bag containing the cocaine bricks to observe them. See United States v. Hernandez-Mieses, 257 F. Supp. 3d 165, 180-81 (D.P.R. 2017). This conduct suggests that the agents were searching for contraband rather than for dangerous persons.

All that said, however, there are crucial gaps in the record relating to the protective sweep. In particular, the district court did not make an explicit finding as to how long it took for the agents to enter the house and arrest Hernandez-Mieses before commencing the sweep.[12] The longer it took for them to commence the sweep, the shorter the sweep and the more likely it was consistent with the durational component of Buie. The district court also did not make explicit findings about how many agents conducted the sweep -- that is, we know ten agents were in the house and that five agents were present when Nazario opened the

---

[12] Hernandez-Mieses does not argue that there was an undue delay between when the agents entered his home and the commencement of the sweep. See, e.g., United States v. Dabrezil, 603 Fed. App'x 756, 760 (11th Cir. 2015) (considering whether it was objectively reasonable for an officer arriving on the scene to commence a sweep seven to twenty-five minutes after other officers had entered the apartment).

cargo van, but it is unclear how many agents swept the two floors of the house.

In light of these important factual gaps in the record on the protective sweep issue, we conclude that a remand is appropriate. Ordinarily, we would not remand so that a party that failed to carry its burden (here, the government) would get a second chance to do so. But the circumstances here are unusual. Although Hernandez-Mieses clearly challenged the legality of the sweep before the district court, he focused on his contention that the agents lacked reasonable suspicion that a dangerous person or persons were hiding on the scene. By not focusing on the sweep's duration and scope, important elements of the protective sweep analysis, Hernandez-Mieses bears some responsibility for the lack of focus by the government and the district court on these aspects of the sweep. Therefore, we think it appropriate, in these circumstances, to vacate the district court's determination that the sweep was lawful and remand for the court to develop the factual record as to the sweep's duration and scope, with a particular focus on how much of the twenty-two-minute window between when the agents arrived at the house and when they called the government attorney was taken up by the sweep. Based on its further factual findings, the district court should then determine whether the government has met its burden of demonstrating the

sweep's legality.[13]   If the government can demonstrate that the sweep was consistent with Buie, the agents clearly were entitled to look in the back of the cargo van, given the district court's unchallenged finding that the vehicle was "big enough to harbor several individuals."   Hernandez-Mieses, 257 F. Supp. 3d at 183; see Buie, 494 U.S. at 327 (defining a protective sweep as "a cursory visual inspection of those places in which a person might be hiding" (emphasis added)).

**D.  Seizure of Drugs from Cargo Van (Automobile Exception)**

As an alternative basis for seizing the drugs from the cargo van, apart from the protective sweep, the government argues, and the district court determined, that the drugs were also lawfully seized pursuant to the automobile exception to the warrant requirement.[14]   The automobile exception permits a warrantless search of a vehicle if there is probable cause to believe that evidence of a crime or contraband will be found in the vehicle. See United States v. Kennedy, 881 F.3d 14, 18 (1st Cir. 2018). The district court treated the automobile exception issue as

---

[13] To be clear, we are not retaining jurisdiction of this case.  Rather, upon remand, the district court should make its findings and draw its legal conclusions, and the parties can then decide if a new appeal is warranted.

[14] The district court further determined that the search of the cargo van was warranted by "exigent circumstances" arising from the "hot pursuit" of the two fleeing men. See Hernandez-Mieses, 257 F. Supp. 3d at 186.  The government does not pursue this theory on appeal.

entirely distinct from the protective sweep.  After the district court issued its suppression order, however, the Supreme Court issued a decision that reveals the flaw in that approach.

In Collins v. Virginia, the Court rejected a warrantless search of a motorcycle parked in a partially enclosed section of the defendant's driveway that the officer justified on the basis of the automobile exception.  138 S. Ct. 1663, 1671 (2018).  The Court held that the automobile exception by itself "does not afford the necessary lawful right of access to search a vehicle parked within a home or its curtilage because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage."  Id. at 1672.  In other words, if an officer wants to search a vehicle located within the curtilage of a home based on the automobile exception, the officer must first have a lawful basis for accessing the vehicle.  See id. ("Just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant[,] . . . so, too, an officer must have a lawful right of access to a vehicle in order to search it pursuant to the automobile exception.").

The district court did not specifically consider whether the cargo van was within the curtilage, but there is no doubt that it was.  It was parked in the attached garage, and attached garages are typically part of a home's curtilage.  See United States v.

- 23 -

Dunn, 480 U.S. 294, 307-08 (1987) ("[T]he general rule is that the [c]urtilage includes all outbuildings used in connection with a residence, such as garages . . . connected with and in close vicinity of the residence." (second alteration in original) (internal quotation marks omitted)).  Thus, to rely on the automobile exception to search the cargo van, the agents needed a lawful basis for entering the garage.

As described above, the agents' putative reason for entering the garage was to conduct the protective sweep.  Therefore, the agents' recourse to the automobile exception depends on the legality of the sweep.  We therefore vacate the district court's judgment as to the application of the automobile exception to the cargo van.  On remand, the district court should reassess the automobile exception issue in relation to the cargo van depending on the court's determination regarding the protective sweep.[15]  We note, however, that it would be unnecessary for the government to pursue this alternative theory on remand.  If the district court determines that the protective sweep was lawful, as described above, the agents had a basis for entering the garage and for

---

[15] The government has not argued that the search of the cargo van pursuant to the automobile exception was permissible because the agents were acting in good-faith reliance on pre-Collins precedent.  We make no judgment on the viability of any such argument.

opening the cargo van.  If the district court determines that the protective sweep was not lawful, the agents did not have any basis for entering the garage, and the automobile exception is unavailable.

**E. Seizure of Evidence from Minivan (Automobile Exception)**

The district court also denied suppression of the items seized from the minivan parked in the driveway based on the automobile exception to the warrant requirement.  Again, in light of Collins, we face the question of whether the minivan was within the curtilage, and if so, whether the agents had lawful access to the vehicle.

It is well established that where there is some doubt about whether an area is part of the home's curtilage, a court must consider

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

Dunn, 480 U.S. at 301; see United States v. Owens, 917 F.3d 26, 34-35 (1st Cir. 2019), petition for certiorari pending, No. 19-21 (filed July 3, 2019) (noting that the Dunn factors should be applied to determine whether a particular driveway is part of the curtilage).  The Court did not make any findings regarding the Dunn factors, and we are loath to make the fact-specific

- 25 -

determination in the first instance. Although there are photographs of the driveway in the record that establish its proximity to the home and the fact that it was not enclosed, the record is not developed as to Dunn factors 3 (nature of the uses) and 4 (steps taken by the resident to protect the area from observation). The fact that the minivan "was parked in an open space and could be seen from the street," Hernandez-Mieses, 257 F. Supp. 3d at 174, is not dispositive, see Collins, 138 S. Ct. at 1675 ("So long as it is curtilage, a parking patio . . . into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage.").

We therefore vacate and remand as to the search of the minivan so that the district court can determine whether the vehicle was within the curtilage. If it was, the district court should determine whether the agents had any lawful basis -- other than a protective sweep -- for accessing the vehicle.[16] See Collins, 138 S. Ct. at 1672. If the district court determines that the minivan was not within the curtilage, the court should determine whether the agents had probable cause to search the vehicle pursuant to

---

[16] Nazario testified that the purported protective sweep concluded with the search of the garage, and the government did not argue that the minivan was accessed or searched pursuant to a protective sweep.

- 26 -

the automobile exception without relying on any unlawfully obtained information.

## III.

For the foregoing reasons, we affirm in part and vacate and remand in part the district court's suppression order. The district court correctly determined that the gun, cellphones, and cash found on the first floor were lawfully seized. However, we vacate and remand as to the cellphones on the second floor and the drugs in the cargo van so that the district court can make further findings as to the duration and scope of the purported protective sweep. We also vacate and remand as to the application of the automobile exception to the cargo van so that the district court can reconsider the issue based on its conclusions regarding the sweep. Finally, we vacate and remand as to the items seized from the minivan so that the district court can determine whether that vehicle was within the curtilage.

So ordered.