Filed 12/26/23  P. v. Langi CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for pur- poses of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOHN KATOA LANGI,<br><br>        Defendant and Appellant. | A166549<br><br>(San Mateo County Super. Ct. No. 19NF012245A) |

John Katoa Langi pled no contest to one count of possessing an assault weapon.  This appeal challenges the denial of his motion to suppress evidence seized after what he asserts was an invalid search of his house and garage.  We affirm.

## BACKGROUND

Langi was on medical leave from his job when he turned up at his workplace around midnight carrying a golf club.  A coworker asked why he had the club; he replied, " 'because I can't have my guns.' "

Langi was still on the premises in his parked pickup truck when his employer, Daniel Yongue, arrived later that morning, but he left when he saw Yongue. Concerned about the incident, Yongue called 911 to request a welfare check on Langi at his home.  Corporal Brian Blake and Officer Nielson were dispatched to the residence at about 11:00 a.m.

1

Langi's pickup truck and an SUV were parked in the driveway when the officers arrived. Beyond the driveway, a gate to a front breezeway and the home's front door were both open. There was a leashed dog on the front porch. Corporal Blake approached the front door while Officer Nielson stayed in the driveway watching the second story windows for signs of movement.

Corporal Blake tried to contact the home's inhabitants by loudly announcing " 'knock, knock' " from four or five feet away and "calling to any residents from just in front of this gate[d] area through into the door." He could hear a television or radio from inside, and items he could see in the breezeway and inside indicated there were people home.

While Blake was trying to contact the house's inhabitants, Officer Nielson spotted two guns in plain view on the floorboard of Langi's pickup truck. The truck's windows were rolled down enough to reach inside. Both guns appeared to be Glock-style handguns, and an illegal extended magazine, loaded, protruded from one of them.

Corporal Blake notified dispatch and asked for additional officers to "help establish a. . . game plan" to handle the situation safely. He was concerned about the firearms and the report of a disgruntled employee "with possibly some mental health issues or other medical issues" showing up at work while on leave and talking about bringing guns to the workplace. Moreover, Blake did not know who was in the house or "what type of crime scene [it might be] or if we had injured or possibly hostages inside;" the front doors were open; and the officers' numerous attempts to contact Langi and his wife by phone had gone unanswered. According to Blake, "it definitely caused us concern as maybe we had a killed family inside or a suicidal person or it just - - as time progressed, I became more curious and concerned." Of yet

2

further concern, the house was within about 100 yards of an elementary school.

Eventually another 10 to 14 officers arrived at the site, out of "what we call an abundance of caution; some for traffic control while we tried to establish contact in the home." Officers shut down the street to vehicle and pedestrian traffic, called for an armored vehicle, and advised the school to shelter in place. Other officers established a perimeter and watched the house for "alarms or anyone coming out."

The officers were unable to contact anyone in the house for an hour and ten minutes. At that point, a Lieutenant Kallas finally reached Langi's wife by phone. Ms. Langi then came outside, where she spoke with Blake and told him she understood (from Kallas) the police were there to check on her husband and anyone else in the home. She told him that her two sons and her mother were in the house and that Langi was sleeping in the garage.

Ms. Langi gave the officers permission to retrieve the guns from Langi's truck. As an officer did so, the car alarm triggered. At that point, Ms. Langi's sons and mother came out of the front door, and Mr. Langi emerged from a side door and was arrested. An officer searched him and found a paper packet containing what appeared to be narcotics. After the officers retrieved the guns, they found that one had a serial number and was registered to Langi, while the other, the loaded gun with the extended magazine, had neither a serial number nor a registered owner.

The officers immediately entered the house to conduct a one- or two-minute protective sweep of the house and garage. Blake did not know who ordered the sweep. The department typically conducted them when they were "looking for people; whether victims, bodies or anyone injured or any threats, anyone hiding. Merely, as far as a safety aspect, to make sure . . . that

3

we have everyone in the house" and to protect the officers against an "ambush-type scenario." He was not surprised a sweep was ordered considering Langi's appearance at work, his mention of guns, the guns in his truck, the vague workplace threat, the uncertainty about Langi's mental state, and the open door and noise from within the house but no actual people responding to the officers for more than an hour. He described the situation as "eerie" and was worried about what sort of "planning" might be happening inside the house during the apparent standoff.

After the protective sweep established no safety threat, most of the officers left the scene.

Two officers who performed the sweep informed Blake they had seen assault rifle ammunition scattered in the garage. Blake told Ms. Langi about the ammunition, asked if she was aware of any assault rifles in the home, and asked permission to search the garage for illegal weapons. Ms. Langi said she did not think there were rifles in the house and initially said she preferred that the officers obtain a search warrant but ultimately agreed to the search.

Corporal Blake found a .223-caliber AR-15-type assault rifle, a Tec-9 .9-millimeter assault rifle, another Glock extended magazine, two unregistered semi-automatic shotguns, and an unregistered .22-caliber semi-automatic rifle mounted on a wall in the "very cluttered" garage. One of the guns was confirmed to be stolen. A subsequent search revealed additional guns and ammunition in a washing machine, between two mattresses, on top of a refrigerator, and in a container in the garage.

Langi was charged with one felony count of carrying a loaded firearm in his vehicle and two felony counts of possessing an assault weapon. After unsuccessfully moving to suppress the evidence found in his truck, garage, and home, he pled no contest to one count of possessing an assault weapon pursuant to a negotiated plea. The court dismissed the remaining charges.

4

## DISCUSSION

Langi contends the court erred in refusing to suppress the evidence found in his home and garage because the facts known to the officers when they conducted the protective sweep fell short of the standard established in *Maryland v. Buie* (1990) 494 U.S. 325 (*Buie*).  Reviewing the trial court's express and implied factual findings for substantial evidence and exercising our independent judgment to determine whether the sweep was reasonable on those facts (*People v. Macabeo* (2016) 1 Cal.5th 1206, 1212), we disagree.

Under the Fourth Amendment to the United States Constitution, police must obtain a warrant before conducting a search or seizure unless an exception to the warrant requirement applies. (See, e.g., *People v. Williams* (1999) 20 Cal.4th 119, 125-126.)  Where a defendant challenges the lawfulness of a search or seizure, the People must produce proof sufficient to show by a preponderance of the evidence that one of those exceptions applies.  (*People v. Romeo* (2015) 240 Cal.App.4th 931, 939.)

The protective sweep doctrine is one such exception.  In *Buie, supra,* 494 U.S. at p. 327, the United States Supreme Court established the legal standard for a protective sweep, a limited police search of premises designed to ensure officer safety.  The court noted that "the Fourth Amendment bars only unreasonable searches and seizures," and that the determination of reasonableness depends on a balancing of the defendant's Fourth Amendment interests against the law enforcement action's promotion of legitimate governmental interests.  (*Id.* at p. 331.)

The court explained that, like a *Terry* stop and frisk (*Terry v. Ohio* (1968) 392 U.S. 1) and the preventative search of an automobile for weapons during a roadside encounter (*Michigan v. Long* (1983) 463 U.S. 1032), a protective sweep conducted without a warrant or probable cause complies with the Fourth Amendment if there are "articulable facts which, taken together

with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Buie*, supra, 494 U.S. at pp. 331-333, 334.) This "reasonable suspicion" standard, " 'one of the relatively simple concepts embodied in the Fourth Amendment,' . . . strikes the proper balance between officer safety and citizen privacy." (*Id.* at p. 334, fn. 2.) It is not a " 'finely-tuned standard[],' comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence," but rather a "fluid concept[]" that takes its substantive content from the concrete factual circumstances of each individual case. (*Ornelas v. United States* (1996) 517 U.S. 690, 696.)

The high court has thus repeatedly held that courts assessing the existence of reasonable suspicion must evaluate the totality of the circumstances on a case-by-case basis to see whether the officers had a ' "particularized and objective basis' " for their suspicion. (*United States v. Arvizu* (2002) 534 U.S. 266, 273.) This process allows officers on the scene "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " (*Ibid.*) Concomitantly, the high court has criticized lower court decisions precluding police from relying on facts consistent with an innocent as well as a guilty explanation if the circumstances and their expertise so warrant. (*Id.,* at pp. 274-276; *United States v. Sokolow (*1989) 490 U.S. 1, 9-10.)

Finally, we must be mindful of the requirement that the government point to specific facts and reasonable inferences that a building may harbor a dangerous person. (Compare *People v. Celis* (2004) 33 Cal.4th 667, 679-680 (*Celis*) [police had no particularized facts suggesting a dangerous person was inside house] and *People v. Chen* (2020) 50 Cal.App.5th 952, 956 [same]

6

with *People v. Ledesma* (2003) 106 Cal.App.4th 857, 865-867 (*Ledesma*) [cars parked near residence used for suspected drug dealing suggested presence of potentially dangerous person].) Any building could, theoretically, contain a dangerous person. The risk must be based on particularized facts, not an abstract possibility or a mere hunch, to ensure that sweeps are not permitted as a matter of course in derogation of the Fourth Amendment. (*United States v. Carter* (10th Cir. 2004) 360 F.3d 1235, 1242-1243.)

Applying these principles, we conclude the protective sweep in this case complied with the Fourth Amendment. As Corporal Blake aptly said, it was an eerie situation—a puzzling, silent standoff, during which the officers were legitimately concerned that the occupants in the house may be planning an ambush. (See *United States v. Winston* (1st Cir. 2006) 444 F.3d 115, 117-119 (*Winston*) [sweep justified when suspect's girlfriend briefly misdirected police, creating five-minute delay that may have given suspect time to prepare ambush].) The officers had found guns, at least one of them loaded and illegal, in Langi's parked truck. The house appeared to be occupied—the front door was open; the officers could hear sounds from inside; and multiple vehicles were parked in the driveway and front of the house. (See *Ledesma*, *supra*, 106 Cal.App.4th at pp.864-866.) Langi had made the bizarre reference to guns at work, prompting his employer and the police to be concerned about his mental state. No one responded to the officers' calls or appeared anywhere—for more than an hour, in the middle of the day—despite the cars parked outside and the sounds coming from within. Indeed, the department was so concerned that it warned the nearby school to shelter in place. When Ms. Langi eventually emerged from the home, she confirmed that there were other people in the home. A two-minute protective sweep of the residence and garage was both reasonable under the Fourth Amendment and prudent.

7

Langi disagrees. He argues there was no evidence his elderly mother-in-law or juvenile sons posed a danger to the officers or bystanders, or that there were other people in the home. While that ultimately turned out to be the case, courts may not second-guess the reasonable determinations made by police officers in potentially dangerous and rapidly developing circumstances. (*United States v. Sharpe* (1985) 470 U.S. 675, 686–687.) Although Ms. Langi's explanation was reassuring, the officers were not required to accept it (see *People v. Ovieda* (2019) 7 Cal.5th 1034, 1043 (*Ovieda*), particularly given the long delay, the guns, the facts indicating the presence of people inside the house, and the other reasons for concern discussed above. (See *United States v. Thompson* (8th Cir. 2021) 6 F.4th 789, 793 [sweep justified in part by delay responding to police and other suspicious behavior]; *Winston, supra*, 444 F.3d at pp. 118-119.)[1]

Langi relies heavily on his claim that the officers were informed *before* the sweep that the report of his threatening comment at work had proven unsubstantiated. The record tells a different story. Langi's claim rests on Corporal Blake's testimony that he was told prior to the sweep that "there wasn't any criminal wants [*sic*] for him" resulting from the workplace incident.[2] The point is of little significance here; whether or not

---

[1] Langi does not contend—and thus forfeits the argument—that *Buie* does not allow police to sweep a home when they arrest a person *outside* the home. (See *Celis, supra*, 33 Cal.4th at pp. 678-679 [flagging the issue]; *United States v. Banks* (10th Cir. 2018) 884 F.3d 998, 1014-1015 [agreeing with other circuit courts that there is no categorical bar to *Buie* sweeps when the arrest is outside].) The situation here suggested a risk to officers outside the house—e.g., a person shooting through a window.

[2] In full, the relevant cross-examination was as follows. "Q. So prior to Mr. Langi or Ms. Langi exiting the residence, you had spoken to Lieutenant Kallas and he confirmed that there were no criminal threats or crimes that had occurred at Mr. Langi's workplace. Is that correct? [¶] A. No. I don't believe I actually

the incident resulted in a decision to issue a warrant, Langi's comment about bringing guns to work and the firearms in his truck were enough to raise a reasonable concern about the safety of officers and others.

Langi also misconstrues *Ovieda, supra,* 7 Cal.5th at p. 1044, which he says stands for the proposition that "an exigent circumstances analysis is appropriate in determining whether a protective sweep was justified." It does not. (See *ibid.*) To the contrary, the Court has expressly stated that "unlike warrantless entry into a house based on exigent circumstances," which "must be supported by *probable cause*," a *Buie* sweep "can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person." (*Celis, supra,* 33 Cal.4th at p. 678.)

Considering the totality of circumstances, we conclude the brief inspection of the garage and house was a valid *Buie* sweep. We therefore do not address Langi's further contentions that the sweep was not justified under the community caretaking doctrine or as a consensual search.

---

personally spoke with Lieutenant Kallas. I believe that information was relayed - - again, with the nature of the call and now the amount of officers on scene, I don't know who exactly or how that relay of info would have transpired, but I was informed or aware that there was no - - I was updated essentially that there was no criminal want [*sic*] [¶] . . .[ ¶] . . . for him, based on what had happened. . . . [¶] Q. Okay. [¶] So it was relayed to you and you were updated while you were waiting on scene that there were - - essentially, there was no wants [*sic*] for Mr. Langi because of any crime that had occurred at the workplace? [¶] A. Yeah - - yes. I think the - - I mean, once we had [Ms. Langi] on the phone, she actually very quickly came outside. So I don't know if there was a relay of info in that. Based on his extended conversation with the reporting party, we knew that there wasn't any criminal wants [*sic*] for him, yes, at the workplace."

## DISPOSITION

The judgment is affirmed.


                                                      BURNS, J.

WE CONCUR:


JACKSON, P.J.
CHOU, J.

*People v. Langi* (A166549)

10