*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-1226

GREGORY GREEN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-5741-14)

(Hon. Milton Lee, Trial Judge)

(Argued June 4, 2019                                    Decided July 9, 2020)

*Ethan H. Townsend*, with whom *Charles B. Wayne* was on the brief for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Charles Willoughby*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, FISHER, and EASTERLY, *Associate Judges.*

Opinion for the Court by *Associate Judge* GLICKMAN.

Concurring opinion by *Associate Judge* EASTERLY at page 33.

Dissenting opinion by *Associate Judge* FISHER at page 33.

GLICKMAN, *Associate Judge*: Gregory Green challenges his convictions for armed robbery and felony murder while armed on several grounds. We need address only one of them, his claim that the trial court erred in denying his motion to suppress evidence the police obtained from his cell phone. Mr. Green argues that this evidence was the fruit of an illegal search and seizure arising from the presence of law enforcement agents in his home without a search warrant or other legal justification. Because we agree that the trial court should have granted the motion to suppress the cell phone evidence, and because the erroneous admission of that evidence at Mr. Green's trial was not harmless beyond a reasonable doubt, we reverse his convictions.[1]

---

[1] Appellant also argues that the trial court committed other errors entitling him to reversal: by using a husher during portions of *voir dire* in violation of his right to a public trial; by failing to grant a mistrial to remedy a *Brady* violation; by instructing the jury inaccurately with respect to aiding and abetting; and by imposing consecutive sentences. His argument regarding use of the husher appears to be foreclosed by this court's decision in *Blades v. United States*, 200 A.3d 230, 241 (D.C. 2019) (holding that "use of the husher during individual-juror *voir dire* did not constitute closure or partial closure of the courtroom, but instead was a reasonable alternative to closing the proceeding that protected appellant's public-trial right" (internal citation, quotation marks, and alterations omitted)). And because we reverse appellant's convictions and the other issues are unlikely to recur if he is retried, we need not address them. *See Broom v. United States*, 118 A.3d 207, 217 n.3 (D.C. 2015).

**I.**

Early on the morning of March 29, 2014, Derrick Williams was shot, killed, and robbed in front of his home in Southeast Washington, D.C. Mr. Williams's friend and roommate, Mr. Tillman, heard the shooting, ran to the door, and made eye contact with a man who was standing over Mr. Williams's body and going through his pockets to rob him. Mr. Tillman recognized this man as someone he knew from the neighborhood by the nickname "Face." He told the police that "Face" was dressed in black and had on a dark hat with white lettering. Mr. Tillman also observed that "Face" was accompanied by a man wearing a red Helly Hansen jacket. He was uncertain of this second man's identity but thought it might have been somebody known as "Little Charles."

A few days later, at around 9:50 a.m. on April 2, 2014, U.S. Marshals executed an arrest warrant for appellant, who was believed to be "Face." The Marshals made the arrest at appellant's home, apparently when he opened the door to them, and at some point they entered the residence and removed the other

persons who were there.[2]  The Marshals then remained inside appellant's home by themselves.  The record does not clarify what the Marshals were doing in the home after having cleared the premises, or exactly when they eventually left.  They did not have a search warrant for appellant's home.

After appellant was taken into custody, Metropolitan Police Department Detective Travis Barton was called to the scene.  Detective Barton was the government's only witness at the suppression hearing.  He testified that one of the Marshals involved in appellant's arrest informed him when he arrived that appellant's cell phone was on a couch in the living room.  The Marshal did not tell Detective Barton how or when the Marshals discovered the phone in the residence or how he knew the phone belonged to appellant.[3]

---

[2]  There was no testimony in the trial court proceedings as to exactly where at appellant's home he was arrested, and the motion judge made no finding on the point.  However, the government's opposition to appellant's suppression motion represented that appellant was arrested "inside of" his residence when he "answered the door," and the affidavit supporting the post-arrest warrant to search appellant's cell phone similarly stated that the Marshals arrested appellant "when he answered the door from inside of" the residence.  For present purposes, however, the precise location of appellant's arrest at his home is immaterial.

[3]  The Marshals did not take the phone from appellant when they arrested him.

Detective Barton entered the dwelling. He did not have a search warrant at the time. He went in, he testified, to "see if the cell phone was there" and to "gather information . . . for the search warrant" by "[t]alk[ing] to the officers inside [and] find[ing] out if they had any additional information related to what [the police] were doing as far as the search warrant or any visible evidence they saw when they were inside the house." The record does not disclose why the Marshals were still in the residence at this time, which was nearly an hour after appellant's arrest, in the absence of a search warrant. Detective Barton testified that the Marshals already had finished conducting their protective sweep of appellant's home and had "secured" the location before he entered it.

Once inside, Detective Barton looked for the cell phone on the living room couch and did not find it there. The Marshals did not know what had happened to it. To find it, Detective Barton called appellant's phone number.[4] He heard a phone ring outside the house. Detective Barton went out and found the phone in the hands of appellant's girlfriend. She identified it as belonging to appellant, and the detective then seized it.

---

[4] Detective Barton had obtained appellant's phone number the day before the arrest.

The following day, Detective Barton applied for and obtained a warrant to search the cell phone. His affidavit in support of the application stated that the phone had been identified as appellant's by his girlfriend. To identify the phone with particularity, the affidavit also included the phone's unique serial and International Mobile Equipment Identity numbers. Detective Barton had obtained those numbers by taking off the phone's back cover and removing its battery.

The phone's call log revealed that appellant had received several calls in the minutes following Mr. Williams's murder from a phone number listed under the name "Charlie" in the phone's contact list. The phone also contained photos of appellant from a social media account that included the word "face" in its username; photos showing appellant wearing a dark baseball cap with white lettering; other photos showing him in a red Helly Hansen jacket; and text messages between appellant and his child's mother indicating that appellant did not show up for a planned meeting with her on the night of the murder.

In moving to suppress his cell phone and the evidence obtained from it, appellant argued, *inter alia*, that his Fourth Amendment rights were violated by the search of his home without a search warrant after the purpose of the arrest warrant had been satisfied, and by the seizure of his phone from his girlfriend "without the

authorization of any warrant [and without] the justification of any exception to the warrant requirement." In its opposition, the government argued that exigent circumstances justified the warrantless seizure of the phone because it was "in imminent danger of destruction or loss."

After Detective Barton's testimony at the suppression hearing revealed that the Marshals had concluded their protective sweep before his warrantless entry into appellant's home, appellant argued more specifically that the detective had engaged in an unlawful search and that the seizure of his cell phone was the fruit of that illegality:

> [O]ne issue that's presented is that . . . there's a warrantless search when [Detective Barton] enters the apartment. The apartment's been secure[d]. He's not entering for the purpose of securing the apartment. At that point, it[] . . . doesn't fall underneath the *Buie*[5] exception for a protective sweep. The marshals have already done that. He enters, whether it was with [or] partially [with] the purpose of talking to other officers inside or looking for evidence, clearly, what happened was he did look for this cell phone . . . . It's only as a result of that . . . entry into that house, that he—it leads

---

[5] *Maryland v. Buie*, 494 U.S. 325 (1990). As we discuss below, in *Buie* the Supreme Court held that the Fourth Amendment permits police making a lawful in-home arrest to conduct a limited, "cursory" search of the surroundings, on less than probable cause and without a search warrant, in order to ensure their safety.

> him, by the officer's own account, to call that cell phone
> and discover it in the hands of [appellant's girlfriend].

Appellant added that Detective Barton's "concern about what happened with the [cell phone]" was the "result of [the] warrantless entry into the home" and that, "but for that warrantless entry," Detective Barton would not have called the phone. The judge expressed skepticism that the absence of a search warrant meant the police had no right to be on the premises. Appellant answered that "at that point, they didn't have the right to be on the premises" because appellant and all civilians had been removed and "the limited purpose of a protective sweep had been satisfied." After having done that, appellant added, the police could secure the scene, if they needed to do so, but only "from the outside" of the dwelling.

In contrast, the government argued that Detective Barton had the right to go into the house to confer with the Marshals there in order to prepare a particularized and complete application for a search warrant; and that while he was there for that lawful purpose, Detective Barton "ha[d] every right to look at things that are in plain view and the phone should have been in plain view and it wasn't." It then was reasonable for the detective to call the phone in order to locate it, and then to seize it to prevent the loss or destruction of evidence. The government premised

this argument on its contention that the Marshals were allowed to remain inside appellant's home to secure it "in anticipation of a search warrant."

The judge found that "it seem[ed] as though the intention of law enforcement" at the time Detective Barton entered the residence "was to seize the scene to make sure that they could locate any evidence that may be connected to the offense." The judge ruled that law enforcement was "certainly in a position to do that under the Fourth Amendment." He further ruled that once Detective Barton discovered that appellant's cell phone was not on the couch, "the exigency seem[ed] clear." Concluding that this exigency—the risk that valuable evidence might be lost if the police could not find and recover the cell phone immediately— justified the detective's warrantless seizure of the phone, the judge denied the motion to suppress the phone and the evidence obtained from it. The prosecution presented and relied on that evidence at trial.

## II.

Appellant contends that Detective Barton entered his home after the justification for any law enforcement presence there without a search warrant was over, that the detective did so to collect evidence, and that the trial judge should have suppressed the evidence obtained from the search of his cell phone as the fruit

of the warrantless intrusion. The government rejoins that the Marshals were justified in remaining in the premises to secure it pending the issuance of a search warrant, and that the detective therefore could join them for the purposes he did without infringing appellant's Fourth Amendment rights. The sole basis on which the government has sought to justify Detective Barton's entry is the putative lawfulness of the Marshals' presence inside the residence to secure the scene and guard any evidence located there.

When reviewing a trial court's denial of a motion to suppress evidence, we defer to the court's factual findings unless they are clearly erroneous, but we review the court's legal conclusions *de novo*.[6] For the reasons that follow, we agree with appellant that his Fourth Amendment rights were violated.

The Fourth Amendment prohibits "unreasonable searches and seizures."[7] A search occurs within the meaning of the Fourth Amendment when the police physically intrude on a constitutionally protected area in order to obtain

---

[6] *See Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019) (explaining "that our analysis of constitutional questions under the Fourth Amendment is [not] constricted" and that our review of the trial court's conclusions of law is *de novo*).

[7] U.S. Const. amend. IV.

information.[8]  Because the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,"[9] it is a basic principle of Fourth Amendment jurisprudence that "searches and seizures inside a home without a [search] warrant are presumptively unreasonable"[10] unless they come within one of "a few specifically established and well-delineated exceptions."[11] The government bore the burden, therefore, of identifying an exception to the warrant requirement that applied here.

As previously mentioned, the  government has relied on only one of those few exceptions to justify the Marshals' and Detective Barton's entry and continuing presence in appellant's home—the alleged need to impound the premises pending execution of a search warrant to prevent unauthorized persons from entering and removing or destroying evidence.  We address the applicability of this exception, but before we do, we think it will be helpful to an understanding of the issue we confront to explain briefly why other potentially available exceptions did not justify the law enforcement intrusion in this case (and have not

---

[8] *United States v. Jones*, 565 U.S. 400, 407 (2012).

[9] *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotation marks omitted).

[10] *Id.* at 586.

[11] *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quotation marks omitted).

been relied upon by the government).  Those inapplicable exceptions are three in number: (1) the authority that may be provided by an arrest warrant; (2) entry to conduct a protective sweep of the home for safety purposes; and (3) exigent circumstances arising from an imminent threat of removal or destruction of evidence in the home.

First, while the Marshals were armed with a warrant for appellant's arrest, that did not justify their prolonged occupation of appellant's home, nor Detective Barton's subsequent entry.  "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within," for the purpose of making the arrest.[12]  While officers are effecting a lawful arrest, "search incident to arrest" doctrine allows them to search "the area into which an arrestee might reach in order to grab a weapon or evidentiary items,"[13] and the "plain view" doctrine allows the arresting officers to seize incriminating evidence in their plain view at the time.[14]  But the government has not claimed, and the record does not

---

[12]  *Payton*, 445 U.S. at 603.

[13]  *Chimel v. California*, 395 U.S. 752, 762-63 (1969).

[14]  Police may seize evidence in plain view without a search warrant if the seizing officer is "lawfully located in a place from which the [evidence] can be

*(continued…)*

show, that the Marshals discovered appellant's cell phone in the course of arresting appellant. And an arrest warrant is not a substitute for a search warrant.[15] By itself, an arrest warrant does not authorize law enforcement officers to carry out a broader search of the arrestee's dwelling for evidence; nor does it authorize them to remain inside the dwelling, or enter it, after they have removed the arrestee from it.[16] So the fact that the Marshals had an arrest warrant did not justify their continuing presence or Detective Barton's entry in appellant's home after he had been arrested.

Second, the actions of the Marshals or Detective Barton were not shown to be justified under the "protective sweep" exception to the requirement of a search warrant recognized in *Buie*. A protective sweep is not a search for evidence, nor is it a full search of the arrestee's occupancy; it is "a quick and limited search of [the]

_____

*(…continued)*
plainly seen," the officer has "a lawful right of access to the object itself," and the "incriminating character" of the evidence is "immediately apparent." *Horton v. California*, 496 U.S. 128, 136-37 (1990) (quotation marks omitted); *see also Umanzor v. United States*, 803 A.2d 983, 998-99 (D.C. 2002).

[15] *See Chimel*, 395 U.S. at 763.

[16] And if the arrestee is apprehended outside the home or in the doorway, as appellant reportedly was in this case, see footnote 2, *supra*, an arrest warrant by itself would not authorize police to enter the premises at all.

premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."[17] Thus, a protective sweep may "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and *depart the premises*."[18]

---

[17] *Buie*, 494 U.S. at 327; *see also Young v United States*, 982 A.2d 672, 681 (D.C. 2009). There are two types of sweeps depending on the suspected source of the danger. The first allows the police to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched," even if they lack probable cause or reasonable suspicion to believe such an attack would occur. *Buie*, 494 U.S. at 334. The second allows the police to search beyond immediately adjoining areas of the arrest, but only if they "possess[] a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337.

[18] *Id.* at 335-36 (emphasis added); *see also, e.g.*, *United States v. Starnes*, 741 F.3d 804, 808-09 (7th Cir. 2013) (protective sweep constitutional where "[t]he sweeping officer ran through the apartment briefly," "removed [the apartment's occupants] immediately and vacated the [apartment]," and "all of the police officers remained outside of the . . . apartment until the court issued the [search] warrant"); *United States v. Winston*, 444 F.3d 115, 120-21 (1st Cir. 2006) ("The duration of the sweep must be 'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.' . . . After arresting Winston, . . . all agents departed. There was no evidence that the agents lingered longer than necessary to arrest Winston." (quoting *Buie*, 494 U.S. at 335-36)); *United States v. Paopao*, 469 F.3d 760, 767 (9th Cir. 2006) (police officer's presence in an apartment after an arrest was legal as part of a protective sweep because the officer was not yet "secure in the notion that no one was left in the apartment"); *United States v. Davis*, 471 F.3d 938, 945 (8th Cir. 2006) ("The [protective] search should take no longer than necessary to complete the arrest and leave the premises."); *United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) ("If we assume that the officers initially had

*(continued…)*

The government has not claimed, and there is no evidence, that the Marshals discovered appellant's cell phone in plain view (or otherwise) during their protective sweep of appellant's residence. And Detective Barton confirmed at the suppression hearing that the sweep had ended before he arrived there, meaning the Marshals should have been gone from the residence by then. So the "protective sweep" exception to the warrant requirement did not justify the Marshals' continued presence or Detective Barton's subsequent entry, and the government cannot (and did not) invoke this exception to justify the warrantless discovery of the cell phone.

Third, "[i]t is well established that 'exigent circumstances,' including the need to prevent the destruction of evidence, permit police officers to conduct an otherwise impermissible search without first obtaining a warrant."[19] But the Marshals had no such justification after they removed all persons from appellant's

---

*(…continued)*
justification for a protective sweep, once the officers discovered that nobody else was in the house, the sweep should have ended."); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990) ("Once police eliminate the dangers that justify a security sweep . . . they must, barring other exigencies, leave the residence.").

[19] *Kentucky v. King*, 563 U.S. 452, 455 (2011).

residence, and Detective Barton admittedly went inside for exploratory reasons having nothing to do with the existence of any exigency.

That brings us to the fourth exception to the warrant requirement, the one on which the government relies. It contends the Fourth Amendment allowed the Marshals to impound appellant's residence, pending the issuance of a search warrant, for the purpose of preventing unauthorized entrants from disposing of evidence there, and to seize incriminating items in plain view in the premises while they were doing so.[20] There is authority supporting impoundment in such circumstances, but that does not mean it was lawful for the Marshals to remain *inside* the home after they had arrested appellant and removed all other persons who were present. *Illinois v. McArthur*[21] teaches otherwise.

In *McArthur*, police stood guard *outside* a suspect's home and prevented the suspect from entering it unescorted while they waited for a warrant to search it.

---

[20] It should be noted that the government did not establish either that the Marshals remained in appellant's residence for this reason, or that their discovery of the cell phone while doing so satisfied the additional requirements of the "plain view" exception to the warrant requirement (besides the requirement of lawful presence). See footnote 14, *supra*. Appellant did not directly dispute these matters, however.

[21] 531 U.S. 326 (2001).

The police themselves did not enter the home except briefly to accompany the suspect (who was not yet under arrest) for the sole purpose of ensuring that he did not take the opportunity to destroy drugs concealed there. In order to determine whether this police conduct complied with the Fourth Amendment, the Court "balance[d] the privacy-related and law enforcement-related concerns to determine [whether] the intrusion was reasonable."[22] The Court concluded that "the restriction at issue was reasonable, and hence lawful, in light of the following circumstances, . . . consider[ed] in combination."[23] First, the police had probable cause to believe that the suspect's home contained evidence of a crime.[24] Second, the police had "good reason" to fear that the suspect would destroy the hidden drugs unless they restrained him.[25] Third, and most significantly for present purposes, "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; specifically, by staying outside the home except to escort the suspect in when he chose to reenter it, the police "imposed a significantly less restrictive restraint" and otherwise "left his home and

---

[22] *Id.* at 331.

[23] *Id.*

[24] *Id.* at 331-32.

[25] *Id.* at 332.

his belongings intact."[26]  Fourth, the police guard lasted for only a limited period of time, namely, two hours.[27]

The contrast between the present case and *McArthur* is marked.  In the present case, the Marshals did not "ma[k]e reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy."  After the Marshals arrested appellant and cleared his home, their only law enforcement need was to prevent unwanted entrants from removing or destroying evidence inside the residence before a search warrant could be executed.  The Marshals reasonably could have accomplished that goal with minimal impact on appellant's privacy interests in his home by stationing a guard at the door and securing the premises from the outside.  They had no legitimate reason or need to stay inside the residence for that purpose.  And unnecessarily lingering inside appellant's dwelling

---

[26] *Id.*; *see also id.* at 331 (concluding that the impoundment and restriction on the suspect's unaccompanied access to his home was reasonable, because it was "tailored to that need [to preserve evidence], being limited in time and scope, . . . and avoiding significant intrusion into the home itself"); *id.* at 337-38 (Souter, J., concurring) ("When McArthur stepped outside and left the trailer uninhabited, the risk abated and so did the reasonableness of entry by the police for as long as he was outside.  This is so because the only justification claimed for warrantless action here is the immediate risk, and the limit of reasonable response by the police is set by the scope of the risk.").

[27] *Id.* at 332 (majority opinion).

was a substantial additional invasion of his privacy, much greater than a stakeout outside the premises would have been; for, at a minimum, it exposed the interior and unconcealed contents of the home to the Marshals' continuing scrutiny even if they refrained from formally searching the premises. By any measure, the balance of law enforcement-related and privacy-related concerns in this case compels the conclusion that the prolonged intrusion in appellant's home was unreasonable and hence unlawful under the Fourth Amendment.

*Segura v. United States*[28] does not undermine that conclusion. The government relies on the Court's determination in *Segura* that a warrantless police intrusion into an arrestee's home to secure it while a search warrant was procured did not violate the Fourth Amendment's proscription against unreasonable *seizures* and therefore did not require suppression of evidence the police did not discover during the intrusion (and only discovered later during the execution of a valid search warrant). But that determination is inapposite to the present case, which concerns the applicability of the Fourth Amendment's proscription against unreasonable *searches* to evidence—appellant's cell phone—that the police *did* discover during a warrantless home intrusion. It was undisputed in *Segura* that the

---

[28] 468 U.S. 796 (1984).

warrantless police intrusion in that case did violate the Fourth Amendment's proscription against unreasonable *searches*, and that this violation required any evidence the police discovered during the intrusion to be suppressed. Nothing in *Segura* supports a different conclusion in this case.

In *Segura*, law enforcement agents had probable cause to believe Segura and Colon were trafficking in cocaine from their apartment. The agents arrested Segura in the lobby of his apartment building, took him up to his apartment, and knocked on the door. When Colon answered, the agents entered, "without requesting or receiving permission."[29] After informing those present that Segura was under arrest and a search warrant for the apartment was being obtained, the agents "conducted a limited security check of the apartment to ensure that no one else was there who might pose a threat to their safety or destroy evidence."[30] In plain view in the bedroom, the agents observed drug trafficking paraphernalia.[31] They then arrested everyone in the apartment. After the occupants were removed, two of the agents remained in the apartment for nineteen hours until a search

---

[29] *Id.* at 800.

[30] *Id.* at 800-01.

[31] *Id.* at 801.

warrant was procured.[32]  In executing that warrant, agents discovered additional drug trafficking evidence that they had not noticed during their pre-warrant incursion.

The Supreme Court was concerned only with the admissibility of the additional, previously unseen evidence obtained pursuant to the search warrant. The government did not challenge the Second Circuit's decision affirming the suppression of the evidence discovered before the warrant was obtained as the fruit of an unlawful search, and the Supreme Court stated it had "no reason to question the courts' holding that that *search* was illegal."[33]  "The only issue" before the Court was "whether drugs and other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed."[34]

The opinion for the Court majority concluded that the additional evidence found in executing the search warrant did not have to be suppressed as the fruit of

---

[32]  *Id.*

[33]  *Id.* at 798 (emphasis added).

[34]  *Id.* at 804; *see also id.* ("[N]o issue concerning items observed during the initial entry is before the Court.").

either an unreasonable search or an unreasonable seizure. It was not the fruit of an unreasonable *search*, the opinion explained, because the search warrant was supported entirely by information having a source independent of the first, illegal intrusion; it was information known to the agents before they entered the apartment.[35] And even if the first intrusion amounted to a seizure of the apartment and all its contents, "seen and unseen," that *seizure* (viewed apart from the search) was not unreasonable either, given that the agents had probable cause and undertook only to "preserve the status quo" for the limited time required to obtain a search warrant.[36]

The rationale for the latter conclusion was set forth in Part IV of the Court's opinion.[37] It reasoned that the illegality of the entry into the apartment did "not affect the reasonableness of the *seizure*," because "[u]nder either method—entry

---

[35] *See id.* at 813-14 ("Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or 'fruit of the poisonous tree' is not warranted here because of that independent source.").

[36] *Id.* at 798.

[37] The opinion of the Court was written by Chief Justice Burger. However, only one other Justice (Justice O'Connor) joined the Chief Justice in Part IV. *See id.* at 797 n.†

and securing from within or a perimeter stakeout—agents control the apartment pending arrival of the warrant; both an internal securing and a perimeter stakeout interfere to the same extent with the possessory interests of the owners,"[38] at least where the owners were already under arrest and in custody.[39] But even so, Part IV emphasizes that "[d]ifferent interests are implicated by a seizure than by a search. A seizure affects only the person's possessory interests; a search affects a person's privacy interests."[40] Accordingly, Part IV acknowledges explicitly that the initial intrusion, though not an unconstitutional *seizure*, nonetheless "may have constituted an illegal *search*, or interference with petitioners' privacy interests, requiring suppression of all evidence observed during the entry."[41] This necessarily included evidence in plain view of the intruding agents, because for the

---

[38] *Id.* at 811 (Burger, C.J., joined by O'Connor, J.) (emphasis added).

[39] *See id.* at 813 ("Here, of course, Segura and Colon, whose possessory interests were interfered with by the occupation, were under arrest and in the custody of the police throughout the entire period the agents occupied the apartment. The actual interference with their possessory interests in the apartment and its contents was, thus, virtually nonexistent. We are not prepared to say under these limited circumstances that the seizure was unreasonable under the Fourth Amendment." (internal citation omitted)).

[40] *Id.* at 806 (internal citations omitted).

[41] *Id.* at 811 (emphasis added).

plain view rule to apply, the police must be "*lawfully* located in a place from which the object can be plainly seen."[42]

Thus, on its face, *Segura* cannot be read as broadly holding that whenever the police need to safeguard evidence in an arrestee's home pending the issuance of a search warrant, the Fourth Amendment permits them to enter or remain in the home and secure it from the interior in lieu of guarding it from the outside; or that evidence discovered in such warrantless intrusions will not be subject to suppression. Moreover, the Court's subsequent decision in *McArthur* is plainly incompatible with such a reading of *Segura*. At most, *Segura* supports the proposition that evidence *not discovered* during or by means of the unlawful warrantless intrusion to secure the premises may not have to be suppressed if it is discovered later through execution of a valid, untainted search warrant or other lawful means. Hence, we agree with Professor LaFave that, even in the wake of *Segura*, "if the only risk is loss of evidence by someone thereafter entering the premises, then the police may not take the more intrusive step of making entry into the premises and guarding it from within while the search warrant is obtained."[43]

---

[42] *Horton*, 496 U.S. at 137 (emphasis added).

[43] 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.5(c), at 556 (5th ed. 2012) (footnote omitted).

Although Professor LaFave speaks of "entry" by the police, the same rule logically applies when the police extend their stay in a dwelling after their right to be there under an exception to the warrant requirement expires. In such non-exigent circumstances, absent other justification, the Fourth Amendment requires the police to guard the premises from the outside while awaiting a search warrant, and if a person with a possessory interest over the premises chooses to enter, as was the case in *McArthur*, the police constitutionally may escort that person inside only to ensure he does not remove or destroy evidence.

We therefore conclude that the trial court erred as a matter of law in ruling that the Fourth Amendment permitted government agents without a search warrant to enter or remain in appellant's home for the purpose of "seiz[ing] the scene to make sure that they could locate any evidence that may be connected to the offense" after the issuance of a warrant. Because the government has provided no other sufficient legal justification for the Marshals' initial warrantless finding of the phone in appellant's home, nor for their continued presence or Detective Barton's entry in that home without a search warrant, we hold that these actions violated appellant's Fourth Amendment rights.[44]

---

[44] For two reasons, it would not be appropriate to give the government a second opportunity on remand to carry its burden of justification by attempting to

*(continued…)*

Our next step is to consider the consequence of that violation for this case.

"It has long been the law that evidence collected in violation of the Fourth Amendment is considered 'fruit of the poisonous tree' and generally may not be used by the government to prove a defendant's guilt."[45]  To determine whether evidence can properly be classified as fruits, "the critical inquiry is whether 'the

---

*(…continued)*

fill in the evidentiary record.  First, the government had a full opportunity the first time around; it was on notice from the start that it would need to justify Detective Barton's warrantless seizure of appellant's phone, and the hearing made clear that appellant viewed the seizure as tainted by the unlawfulness of the Marshals' and Detective Barton's warrantless entry into the home.  Second, the government has proffered no additional facts that it would seek to prove if the suppression hearing were reopened. *See Evans v. United States*, 122 A.3d 876, 885 (D.C. 2015) ("The United States had a full opportunity at the original suppression hearing to develop the factual record it deemed necessary to support the admissibility under the Fourth Amendment of the evidence at issue.  We are not inclined to remand to give the United States a second opportunity to develop the record on this point.").  This is not a case in which the government's omissions were caused by the defendant's failure to emphasize an issue below. *Cf. United States v. Hernandez-Mieses*, 931 F.3d 134, 144 (1st Cir. 2019) (holding that although the court would "[o]rdinarily[] . . . not remand so that a party that failed to carry its burden (here, the government) would get a second chance to do so," remand was appropriate where the appellant "b[o]r[e] some responsibility for the lack of focus by the government and the district court" on the legality of the protective sweep's duration and scope at trial, because he did not highlight those issues before the trial court).

[45] *Hooks v. United States*, 208 A.3d 741, 750 (D.C. 2019) (citing *Wong Sun v. United States*, 371 U.S. 471, 484, 488 (1963)).

evidence . . . has been come at by exploitation of th[e] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"[46]

Here, so far as record shows, the cell phone and cell phone data were come at by exploitation of what we have held to be unconstitutional conduct.[47] Detective Barton relied on the Marshals' unconstitutional discovery of the cell phone, and on his own unconstitutional entry, search, and discovery that the phone was not in appellant's residence, to locate and seize the phone when he did. If the Marshals had never found the phone to begin with, there is no reason to suppose Detective Barton would have looked for it when he entered appellant's home or would have found and seized it when he did; he relied on the Marshals' report of their discovery. Even assuming (without a basis in the record) that the Marshals lawfully discovered the phone, Detective Barton still would not have learned that the phone was missing had he not gone into the dwelling, and then he would not have searched for it inside the dwelling, discovered it in the hands of appellant's

---

[46] *Jones v. United States*, 168 A.3d 703, 721 (D.C. 2017) (quoting *Wong Sun*, 371 U.S. at 488 (quoting John Maguire, *Evidence of Guilt* 221 (1959))).

[47] We note that the government has not argued otherwise. Nor, either in the trial court or on appeal, has the government ever disputed the applicability of the exclusionary rule to the cell phone and cell phone data in this case in the event we were to reject its impoundment theory and find a Fourth Amendment violation for the reasons we do.

girlfriend, and seized it from her. In short, the phone was seized as a direct result of what was learned through intrusions in appellant's home that violated his Fourth Amendment rights.[48]

However, that is not the end of the analysis. Exclusion of evidence is not necessarily mandated by the mere fact that it "would not have come to light but for the illegal actions of the police."[49] The Supreme Court has cautioned that "but-for causality is only a necessary, not a sufficient, condition for suppression."[50] We also must look to the totality of the circumstances to assess whether the evidence was purged of the primary taint, focusing on factors such as: (1) the "temporal proximity" of the illegality and acquisition of the fruits; (2) the existence of "intervening circumstances" causing the seizure of the fruits, such as an act of

---

[48] Moreover, Detective Barton relied on his acquisition of the phone, and the information he obtained from it, to procure the search warrant allowing him to discover the incriminating contents of the phone. Unlike the search warrant in *Segura*, the warrant to search the cell phone seized from appellant's girlfriend was not based entirely on an untainted, independent source. *See also Murray v. United States*, 487 U.S. 533, 542 (1988) (explaining that a search warrant cannot "in fact [be] a genuine[] independent source . . . if information obtained [through unlawful means] was presented to the Magistrate and affected his decision to issue the warrant").

[49] *Wong Sun*, 371 U.S. at 487-88.

[50] *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

independent free will on the part of the arrestee or a third party; and (3) "the purpose and flagrancy of the official misconduct."[51]

The first factor, temporal proximity, has no purgative effect in this case and counsels in favor of exclusion. "[V]ery little time passed between" the Marshals' and Detective Barton's unlawful presence and search in appellant's home and the detective's seizure of the phone from appellant's girlfriend; his search in the home for the phone led him directly and immediately to her.[52]

The second factor, the existence of an intervening circumstance, likewise has no purgative effect because there was no such circumstance in this case. According to Detective Barton, appellant's girlfriend did not offer his phone to him on her own initiative or of her own free will. Rather, the detective testified that he seized the phone from her after she confirmed it was appellant's. Nor, as we have said, did the later issuance of a warrant to search the cell phone constitute an

---

[51] *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

[52] *See Jones*, 168 A.3d at 723 ("First, as the search of Ms. Williams's purse occurred at the scene of Mr. Jones's apprehension and arrest, very little time passed between the police's unlawful cell-site-simulator search and their recovery of the evidence from Ms. Williams's purse."); *Gordon v. United States*, 120 A.3d 73, 86 (D.C. 2015) ("We observe that virtually no time passed between the illegal seizure and the discovery of the warrant . . . .").

intervening circumstance that purged the primary taint of unlawfulness in the phone's seizure, for the phone already had been seized and that fact was the predicate for the warrant's issuance.[53]

The third factor, the purpose and flagrancy of official misconduct, also does not operate to dispel the primary taint of the Fourth Amendment violation. Although the violation may not have been flagrant—the record does not show it to have been knowing or reckless—the fact remains that seizure of appellant's cell phone was a primary aim of Detective Barton's unjustified home intrusion, and it was only that violation that enabled Detective Barton to accomplish that aim.[54]

Based on the totality of the circumstances, we conclude that appellant's cell phone and cell phone data were obtained by exploitation of the Fourth Amendment

---

[53] *Cf. Utah v. Strieff*, 136 S. Ct. 2056, 2062 (2016) (explaining that a valid arrest warrant was a sufficient intervening circumstance because it "was *entirely unconnected* with the [illegal] stop" (emphasis added)).

[54] *See Jones*, 168 A.3d at 723 ("And third, although the police officers' warrantless use of the cell-site simulator here was not flagrant misconduct, recovery of Mr. Jones's cellphone and the complainants' phones was undoubtedly one of the officers' purposes in deploying the cell-site simulator." (footnote omitted)); *Gordon*, 120 A.3d at 86 ("[A]lthough the illegality was not flagrant, the officer's purpose at the time of the seizure—to check Gordon's identity through computer databases that include information about warrant status—weighs in favor of suppression.").

violation, not by sufficiently distinguishable means. The trial court erred in denying appellant's motion to suppress those fruits.

The government argues that any error in admitting the cell phone evidence at trial was harmless. But we are not persuaded, as we must be, that this error was harmless beyond a reasonable doubt.[55] "A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was . . . prejudicial."[56] At appellant's trial, the prosecutor relied upon the evidence collected from appellant's phone for roughly twelve percent of the government's closing argument. The prosecutor emphasized this evidence to shore up the credibility of Mr. Williams's roommate, Mr. Tillman, the only witness who could identify appellant as Mr. Williams's assailant. Linking the calls to appellant's phone from a contact named "Charlie" to the timeline of the crime, the prosecutor told the jury it was "not a coincidence" that, "[o]f all the people that could call the defendant within minutes of the murder," the one who

---

[55] In order to hold that an error implicating a federal constitutional right was harmless, we must be convinced that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967); *Ellis v. United States*, 941 A.2d 1042, 1048-49 (D.C. 2008).

[56] *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004) (internal quotation marks and brackets omitted).

did so had the same name as the person Mr. Tillman had spoken of as appellant's accomplice. The other evidence found in the search of appellant's cell phone lent additional support to Mr. Tillman's identification of appellant. The confirmations that the cell phone evidence supplied were critically important to the prosecution because Mr. Tillman had given false testimony in the past and his credibility was tarnished and in serious question throughout the trial.[57] Given the evidentiary value of the cell phone evidence, and the importance placed on it by the prosecutor, we cannot conclude that its unconstitutional admission was harmless beyond a reasonable doubt.

---

[57] Before Mr. Tillman took the stand, the judge instructed the jury that he had "provided false or perjured testimony while under oath in testifying in another proceeding in January 2016 that relates to the allegations in this case." When the prosecutor questioned Mr. Tillman about this past untruthfulness, the judge paused to instruct the jury that it had "heard testimony that Mr. Tillman had admitted to testifying untruthfully at a prior proceeding" and it "should consider the testimony of someone who has admitted to perjury . . . with caution and scrutinize it with care." The defense anchored its closing in arguments about Mr. Tillman's perjury and general dishonesty. And in his final jury instructions, the judge reminded the jury that "[t]he testimony of an admitted perjurer . . . , in this case, Maurice Tillman, should be considered with caution and scrutinized with care."

We therefore must reverse appellant's convictions and remand for a new trial.

*So ordered.*

E ASTERLY, *Associate Judge*, concurring: I agree entirely with Judge Glickman's suppression analysis, but I would treat as conceded, in absence of any argument to the contrary by the government (or my dissenting colleague), the application of the exclusionary rule. *See Robinson v. United States*, 76 A.3d 329, 342 n.27 (D.C. 2013) (stating that, "just as the government bears the burden to demonstrate that it did not violate a defendant's Fourth . . . Amendment rights, it is the government's burden to prove attenuation" such that the exclusionary rule should not apply).

F ISHER, *Associate Judge*, dissenting: This is a challenging case made more difficult by an inadequate factual record and insufficient briefing. Before we issue such a consequential ruling, we should remand for a renewed evidentiary hearing and then require supplemental briefing.

As I will explain later, the focus of this litigation shifted once it got in the hands of appellate judges. It is regrettable, but not surprising, that the record does

not answer many questions on which the court now has focused. No one questioned that the warrant for appellant's arrest authorized the marshals to enter his home and take him into custody. *Payton v. New York*, 445 U.S. 573, 602-03 (1980). None of the marshals testified, and we do not know how or where they found appellant's cell phone. There is no basis in the record for asserting, as the court does, that the marshals' discovery of the phone was unconstitutional. Nor is there a factual basis for thinking that Detective Barton conducted an illegal search inside the home.

The focus of the suppression hearing was outside the home — on the seizure of the cell phone from appellant's girlfriend. Appellant was also requesting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), claiming that the government had misrepresented material facts when it applied for a separate warrant to search the phone. Although appellant's counsel asserted orally that the marshals should have waited outside for the search warrant to arrive, and that Detective Barton entered the home illegally, those issues had not been briefed.

This court's opinion purports to distinguish *Segura v. United States*, 468 U.S. 796 (1984), factually, but it does not squarely deal with the Supreme Court's holding:

> Specifically, we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises *from within* to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

*Id.* at 798 (emphasis added). The present case turns on whether that holding is still good law.

It is simply wrong to say that "*Illinois v. McArthur* teaches otherwise." *Ante* at 16. In fact, *McArthur* carefully avoided the question which had divided the Court in *Segura* — whether the police could lawfully secure the home from within while awaiting a search warrant. Rather than overruling *Segura*, the Court took the easy path home, noting that "both majority and minority [in *Segura*] assumed, at least for argument's sake, that the police . . . might lawfully have sealed the apartment from the outside, restricting entry into the apartment while waiting for the warrant." *McArthur*, 531 U.S. at 333. There is obvious tension between the holdings of *Segura* and *McArthur*, but the Supreme Court has not resolved it.

Nor have we benefitted from adversarial briefing on this important question. The government quoted *Segura* in its brief, but appellant did not even mention the

case. Appellant does cite *McArthur* in both of his briefs, but for a different proposition. Before holding that the marshals could not lawfully remain inside the house while awaiting the search warrant, we should ask both parties to brief the issue.

If the marshals were lawfully securing the house from within, Detective Barton did not violate the Fourth Amendment by entering the home to join them. And he could take note of what was (or in this case was not) in plain view. *Clark v. United States*, 593 A.2d 186, 196-99 (D.C. 1991) (where initial entry was lawful, and responding officers remained in the premises for a reasonable time and were still there, crime scene search officer could enter and seize items in plain view); *see also Porter v. United States*, 37 A.3d 251 (D.C. 2012) (applying *Clark* and remanding for an evidentiary hearing to clarify facts); *Settles v. United States,* 615 A.2d 1105, 1112-13 (D.C. 1992) (applying the reasoning of *Clark*).

But before we ask for supplemental briefing, we need to know more facts. Because the ground has shifted since the suppression hearing was held, we should remand for further proceedings. *See* D.C. Code § 17-306 ("The District of Columbia Court of Appeals . . . may remand the cause and . . . require such further proceedings to be had, as is just in the circumstances.").

I respectfully dissent.